No. 3675

Second Circuit

———

HARRIS ET AL. v. LOUISIANA OIL
REFINING CORPORATION

———

(March 24, 1930.  Opinion and Decree.)
(April 10, 1930.   Rehearing Refused.)
(June 2, 1930.  Writs of Certiorari and Re-
view Denied by Supreme Court.)

———

Arthur A. LeRosen, of Shreveport, at-
torney for plaintiffs, appellees.

Blanchard, Goldstein & Walker, of Shreve-
port, attorneys for defendant, appellant.

ODOM, J. This is a suit under the Workmen's Compensation laws, Act 20 of 1914, as amended by Act 85 of 1926.

Willie Harris was employed by the defendant corporation as a common laborer and, while at work in the course of his employment, was killed on June 23, 1927.

There survived him a wife, Mary Harris, to whom he was married in December, 1923, and from whom he was never separated, either by judgment of divorce or separation from bed and board. Mary Harris is the mother of one child, Isaac, six months old at the time Willie Harris was killed. His wife brought this suit for compensation for the benefit of herself and her minor child, alleging that her child was the son of deceased, born of the marriage, and that they were both dependent upon the husband and father for support.

The defense is, first, that the plaintiff Mary Harris, the wife, was not living with her husband at the time of his death; second, that she was not dependent upon him for support; and, third, that her infant son, Isaac, was not the child of deceased.

There was judgment for plaintiff, and defendant appealed.

## OPINION

1 and 2. We take up and dispose of the defenses in the order named:

Paragraph (A), subsec. 2, sec. 8, Act 85 of 1926, reads as follows:

"The following persons shall be conclusively presumed to be wholly and actually dependent upon the deceased employee."

Paragraph (B):

"A wife upon a husband with whom she was living at the time of her (his) accident or death."

Paragraph (D):

"A child or children under the age of eighteen years (or over said age, if physically or mentally incapacitated from earning) upon the parent with whom he is, or they are, living at the time of the injury of such parent."

If Mary Harris, the wife, and her child, only six months old (if it be the child of deceased), were in fact living with deceased at the time of his injury and death, they are entitled to compensation under the plain letter of the law. They are conclusively presumed to have been wholly dependent upon him. If, however, they were not living with him, their recovery depends on whether they were in fact dependent upon him, for the act provides that in all cases where there is no conclusive presumption of dependency "the question of legal and actual dependency in whole or in part, shall be determined in accordance with the facts as they may be at the time of the accident and death."

Deceased and Mary were married in August or September, 1923, and were never divorced. During the year 1924, they lived together on the Adger plantation at Gilliam where they made a crop. In the latter part of 1924, or spring of 1925, the testimony not being clear as to the exact date, Mary left Gilliam and went to Belcher and stayed for some time with her grandfather. Just how long she stayed there is not clear, but at some time in 1925 she went to live with her mother and stepfather on the Meyer place, just south of the city of Shreveport and since subdivided and developed into a residental section called "Dixie Gardens." There she remained as a member of her stepfather's family until the death of her husband in June, 1927. Just why she left her husband and the plantation at Gilliam is a controverted point.

She, her mother, her stepfather, and an aunt of the deceased all say that she did not like it there and wanted to return to her mother, and that the reason her husband did not leave at the time and go with her was that he was in debt to the plantation owner and remained to make a crop and pay the debt. She says that she and her husband did not intend to sever their marital relations and that her husband expected to follow her back to the vicinity of Shreveport as soon as he could get released. An aunt of the deceased, with whom they were living at Gilliam, and others testified that as far as they knew there was no misunderstanding or breach between the two and that she gave as her reason for leaving that she did not like it there. We quote plaintiff's testimony on this point as follows:

"He (her husband) asked my mother could I go down there and stay until he paid Mr. Adger some of the money he owed him. He owed him a balance due and he got on a disagreement so he asked my mother could I stay there with her until he paid half the debt and then he was coming to town."

It is certain, however, that immediately after she left, her husband began to live in open concubinage with one Sallie Mae Noyd and that he kept her as his concubine until the day of his death. This led relatives and acquaintances in that vicinity to believe that there was a permanent separation between the husband and wife. The husband left Gilliam at the end of 1924, and in 1925 secured employment at defendant's refining plant at Bossier City, just across the river from Shreveport, where he worked until his death. When he went to Bossier City, he carried Sallie Mae Noyd with him. They roomed together there for a while and later obtained quarters in Shreveport. The concubinage be-

tween them was open and notorious in the section where they lived. But, while that is true, the testimony shows beyond question that neither the husband nor the wife intended or did sever their marital relations. The husband worked at Bossier City and spent the greater portion of his time with his concubine. His wife lived with her mother and stepfather at Dixie Gardens, a short distance away, and during the time she was living there, both before the child was born and after, up to the date of his death, the husband regularly and constantly visited his wife and contributed to her support and the support of the minor child. During his visits, usually at night, the two sustained the relationship of husband and wife, occupying quarters together. These visits of the husband to his wife and their intimate relationship during the while are attested by the wife, her mother, and her stepfather. In addition to their testimony as to the visits, we find the testimony of Alfred Hogan, a colored man who worked with deceased at the refinery, who says that he frequently heard deceased ask to get off so that he could visit his wife. Eddie Davenport, another colored man, who lives in the neighborhood, saw deceased visiting his wife just before his death and knew nothing of the separation. Joe Youngblood also saw deceased in the neighborhood. These are all colored witnesses, but in addition there is the testimony of Mr. Eastman and his wife, white people, whose testimony is unequivocal, that deceased visited his wife and child regularly up to the date of his death. Mr. and Mrs. Eastman lived or did live in Shreveport, where they conducted a restaurant. Plaintiff's mother did laundry work for the restaurant and the family wash. The two, at times together and at others separately, made regular trips to the home of these colored people at Dixie

Gardens to carry the soiled and to get the washed clothes. Mr. Eastman made his trips usually on Sunday. He says that he found deceased with his wife and the family practically every time he went. Mrs. Eastman went there "sometimes once a week, sometimes twice a week, sometimes every Sunday." She was asked: "Was he (the husband) down there with Mary, his wife, at those times?" She answered: "Well, he did not stay there all the time but he was there, back and forth, and I was there sometimes every other day, sometimes once a week and sometimes twice a week, and I couldn't begin to tell you the times I have seen him there both before the baby was born and after."

Asked if she had ever at any time seen or heard anything indicating hard feelings or a separation between them, she replied: "No, none whatever." Mr. and Mrs. Eastman both testified that it was always their understanding that deceased and Mary were husband and wife.

Deceased's visits to his wife were not merely short calls and casual, but he lingered and spent the nights with her. Their conduct was such as to create the impression upon outsiders that, although physically separated the greater portion of the time, they yet were living together as husband and wife in the sense that term is ordinarily understood. They were unquestionably living together physically a portion of the time up to the date of the husband's death. The testimony shows that he was contributing to his wife's support and to the support of the child and, as stated, there is no evidence that either ever intended to sever their marital relations.

We think the husband and wife were "living together" as contemplated by the statute. A physical separation for a portion of the time is not "living apart," where there is no evidence of intent on the part of either to sever the marital relations. These parties actually cohabited up to the time of the husband's death, under conditions which should be and are regarded as constituting marital relations. It is not uncommon for men of this race to keep concubines, and that some of them do so for years without intending to abandon their wives and families is a matter of common knowledge. It was not intended, we think, that the terms "living together" as used in the statute should be construed to mean a physical dwelling together at all times under the same roof, but rather it was intended to cover cases where no break in the marital relations existed. If there is no legal separation, no estrangement, and certainly if there is actually cohabitation for a portion of the time, there is a "living together" as contemplated by the statute.

We quote the following from A Corpus Juris Treatise on Workmen's Compensation Laws, by Mr. Donald J. Kiser, sec. 50:

"In some jurisdictions, it has been held that husband and wife in order to be regarded as living together must be maintaining a home and living together in the same household or actually cohabiting under conditions which would be regarded as constituting a family relation; but there is authority in support of the broader view that a physical living together is not necessary so long as there is no legal separation or an actual separation in the nature of an estrangement."

He cites Northwestern Iron Co. vs. State Industrial Commission, 154 Wis. 97, 142 N. W. 271, L. R. A. 1916A, 366 and note, Ann. Cas. 1915B, 877 and note.

Counsel for appellant cite the case of Milton vs. Long-Bell Lumber Company, decided by this court and affirmed by the Supreme Court in 165 La. 336, 115 So. 582,

420

where it was held that a wife separated from her husband could not recover compensation. But the facts there were different. There, the parties "voluntarily chose to reside apart," their "relations were casual," the evidence "shows conclusively that he (the husband) had abandoned her and she had acquiesced in the abandonment."

In the case of Books vs. Keen & Woolf Oil Company, 9 La. App. 288, 120 So. 99, we held that even though the husband had contracted an illegal marriage and was living with another woman as his wife at the time of his death, the lawful wife was not precluded from recovering compensation, and she was held to be living with her husband and actually dependent upon him for support.

Counsel lay stress upon the fact that the wife made a statement to Mr. Seacat, who represents the defendant corporation, when she appeared at his office after the death of her husband, that she was not living with him at the time he was killed, but living with her mother. That was literally true in the sense that she was living in her mother's house and not under her husband's roof.

It is contended that the minor, Isaac Harris, is not the child of deceased. That the child was conceived during the marriage is not disputed. "The law considers the husband of the mother as the father of all children conceived during the marriage." Civil Code, art. 184.

This presumption ceases, however, "where the remoteness of the husband from the wife has been such that cohabitation has been physically impossible." Civil Code, art. 189. The testimony shows that the child was born in December, 1926, and was therefore conceived during that year; and shows further that during the whole of that year the husband was living either in Bossier City or in Shreveport and the wife at Dixie Gardens, only a short distance away; and still further, that the husband and wife actually cohabited at intervals during the whole of the year 1926.

Eddie Paul, a negro man, testified that he cohabited with Mary Harris at her grandfather's and that he was the father of the child. Mary denies that and says that her husband was its father. Eddie Paul may have visited Mary Harris, but it seems quite evident that he is not the father of the child, because he does not claim to have visited her after she left her grandfather's, at Belcher. The testimony shows that she left there in 1925, and that the child was not born until December, 1926, more than 300 days after he claims to have visited her. The husband never disavowed the child. On the contrary, he visited it and its mother up to the date of his death and contributed to its support. The paternity of the child is sufficiently established by the record. It is in law a legitimate child of the marriage. Civil Code, art. 184.

Our courts have gone a long way to sustain the legitimacy of a child of a wife not divorced. In McNeely vs. McNeely, Executor, 47 La. Ann. 1321, 17 So. 928, 929, the court said:

"It is in our view clear, under our Code, that the legitimacy of the child of the wife not divorced, born after the judgment of separation from bed and board, cannot be disputed, unless the suit is brought by the husband to disavow that legitimacy." Succession of Flynn, 161 La. 707, 109 So. 395.

We have held that the mother was living with the deceased at the time of his death. As the child was with its mother, it follows that it also was living with him.

The judgment appealed from is correct and is therefore affirmed, with costs in both courts.