[95 So. 351]

## ROBINSON v. STANDARD OIL CO. OF LOUISIANA.

### No. 35635.

March 4, 1940.

Rehearing Denied April 1, 1940.

Laycock & Moyse, of Baton Rouge, and Spearing, McClendon, McCabe & Schmidt, of New Orleans, for applicant.

T. M. Milling, A. M. Curtis, and R. B. Jennings, all of New Orleans, and George M. Wallace, of Baton Rouge, for respondents.

ODOM, Justice.

The Court of Appeal, First Circuit, has in two separate opinions stated clearly and concisely the issues involved in this case. Robinson v. Standard Oil Co., 180 So. 237; Id., 191 So. 145. For this reason it is unnecessary to restate the issues in this opinion. In this connection, however, we think it proper to say that we approve the ruling of the Court of Appeal on the several preliminary exceptions filed in the district court.

In each of its opinions the Court of Appeal stated, and correctly, that in order to recover the burden was on plaintiff to show either that she was living with her husband at the time of his death or that she was dependent upon him for support. In each of its opinions the Court of Appeal reviewed the facts adduced at the trial relating to the questions whether or

not plaintiff was living with her husband at the time of his death, and whether or not she was dependent upon him for support. In its second opinion the court rejected her demands on the ground that she had failed to make out her case on either point.

Plaintiff applied to this court for writs, which we granted. Further consideration of the issues involved has confirmed our original view that the Court of Appeal erred in its ruling that plaintiff was not living with her husband at the time of his death. Having reached this conclusion, it is not necessary for us to decide whether she was, at the time her husband died and thereafter, dependent upon him for support.

The trial judge decided the case originally in favor of the plaintiff on both points and gave her judgment. The Court of Appeal decided against her on both points and rejected her demands.

On the first hearing before the Court of Appeal, the case was remanded for the introduction of certain documents which it held had been erroneously excluded by the trial judge. At the second trial in the district court the excluded documents were admitted, after which the trial judge decided for defendant, rejecting plaintiff's demands. But it is not clear that the trial judge changed his opinion, for his second judgment, rendered without written reasons, recites that the case was argued and submitted and "in accordance with the instructions of the Court of Appeal of Louisiana, First Circuit, contained in its judg-

ment rendered April 7, 1938, remanding the case to this court, and the same having been taken under advisement by the court; and the law and the evidence being in favor of the defendant and against plaintiff, for the reasons orally assigned", plaintiff's demands were rejected.

In his written opinion handed down and filed on December 2, 1937, the district judge reviewed at length the testimony adduced at the trial relating to the question whether plaintiff was living with her husband at the time of his death, and based his judgment on the following conclusion reached by him:

"The Court is of the opinion that even though the plaintiff was not living under the same roof with her husband, yet there had been no legal separation, no estrangement or break in the marital relations and there was a 'living together' as contemplated by the jurisprudence of this state."

We approve this ruling and think the Court of Appeal erred in overruling it. The pertinent facts in so far as they relate to the question as to whether plaintiff was living with her husband at the time of his death are not disputed. As to this point, the testimony of plaintiff and her witnesses is not contradicted by that of the witnesses for defendant. Touching the point of dependency, there is some conflict between her testimony and that of her witnesses, and the testimony of defendant's witnesses. But, as to the testimony pertinent to the issue of their living together at the time the husband died, there is no disagreement. The difference of opinion relates

to the question whether, under the facts disclosed, plaintiff was, as a matter of law, "living with" her husband at the time of his death.

The pertinent facts are stated at length by the district judge in his written opinion. They are also stated in the second opinion handed down by the Court of Appeal (191 So. 145). There is no substantial difference between the statement made by the district court and that made by the Court of Appeal. We quote first what the district judge said:

"The testimony discloses, and it is not challenged by defendant, that one Hardin Robinson, an employee of said company, was on account of sickness retired on May 11, 1931, and under the provisions of the Benefit Plan, was given a retirement allowance of $33.00 per month from November 7, 1932, to the date of his death, November 6, 1934.

"The testimony further discloses that the plaintiff was married to Hardin Robinson on August 15, 1931, and on the day following their marriage removed to the Parish of Pointe Coupee; that plaintiff and her husband lived in that parish until September 24, 1932, during which time she was supported by her husband from the allowance of $33.00 per month paid to him by said defendant company.

"It will be observed that Robinson had been retired from the Standard Oil on account of sickness several months previous to his marriage and was evidently in very poor health when he was married to the plaintiff.

"Examining the testimony, we find that Robinson was ill in September, 1932, at which time he left the Parish of Pointe Coupee, and in the latter part of that year removed to Woodville, Mississippi, where he remained until he died. The plaintiff was forced to go to the home of her brother in the City of New Orleans.

"The testimony further discloses that the plaintiff did not receive any assistance or support from her husband from September, 1932, to January, 1934, during which time she was supported by her brother.

"Plaintiff testifies that beginning with the month of January or February, 1934, her husband, who was residing in Woodville, Mississippi, sent her at least $10.00 per month and continued to send her money for her support up to the date of his death in November, 1934. Her testimony in this respect is supported and corroborated by several other witnesses who saw her receive the letters and remove the money orders therefrom. Plaintiff also testifies and defendant's witnesses admit that during the year 1934 she made two visits of several weeks' duration to her husband in Woodville and occupied the same room and bed with him. This fact is also abundantly corroborated by the letters which Hardin wrote to the plaintiff in which he speaks of the great pleasure and joy her visits brought to him.

"A careful examination of the transcript discloses that several of the witnesses called by plaintiff gave clear and positive testimony to the effect that the plaintiff had received monthly remittances from her husband during the year of 1934, but the

same cannot be said for defendant's witnesses. They would not commit themselves positively on this point, simply saying they had not seen Robinson send the plaintiff money and that they knew nothing about it.

"It is true that an official of the defendant company made an investigation of the case and based upon that investigation and report the payment provided for by the Benefit Plan was made to a son of the said Hardin Robinson. But in this connection it must be remembered that the official who made the investigation and report frankly admitted that he had not thought it necessary to interview the wife or widow of the deceased employee, simply being contented and satisfied with the statements made by the son of the deceased, although the plaintiff had previously written to the defendant company in reference to her husband.

"The Court has carefully read a dozen or more letters written by the husband to the wife and found each and every one of them replete with every endearing term which an uneducated person could lavish upon the object of his love and affection.

"Counsel for defendant has sought to create the impression that Robinson deserted his wife in the Parish of Pointe Coupee in the year of 1932, or that they had quarreled and separated. But there is nothing in any of the letters to even suggest or leave the slightest impression that there had ever been any trouble between them. The separation seems to have been caused by the illness of both of them and matters over which they had no control. * * *

"The Court was very favorably impressed with the clear, straight-forward and positive testimony given by plaintiff and her witnesses and their conduct and attitude on the witness stand.

"The Court is of the opinion that even though the plaintiff was not living under the same roof with her husband, yet there had been no legal separation, no estrangement or break in the marital relations and there was a 'living together' as contemplated by the jurisprudence of this state."

As to the testimony on this point, the Court of Appeal, in its second opinion, stated [191 So. 147]:

"We now come to the question as to whether or not plaintiff was 'living with' the deceased at the time of his death within the legal meaning of the benefit plan.

"It appears that plaintiff and the deceased were married in August, 1931, at which time the deceased was drawing sick benefits from the defendant company. The couple lived together with the wife's relations in Pointe Coupee Parish until September, 1932, when the deceased went to Woodville, Miss., and lived with some of his relatives until his death in November, 1934. The wife, shortly after the separation in September, 1932, went to live with her brother in New Orleans. During the remainder of 1932 and during all of 1933, plaintiff had no communication with her husband whatever, nor did she even know where he was living. On February 9, 1934, she wrote to the defendant company asking for information as to the location of her husband, to which the company re-

plied on February 11th that the last address it had of her husband was Woodville, Miss. Obviously, a correspondence was then begun between plaintiff and her husband, as we find letters in the record from him to her beginning in February, 1934, and continuing down to the early part of June of that year. The tone of these letters is affectionate, looking forward to either the wife coming to see the husband in Woodville or the husband visiting the wife in New Orleans. The wife visited and lived with her husband in Woodville for several days in March, 1934, and then returned to New Orleans, and a few weeks later she came back to Woodville and again lived with her husband for several weeks, going back to New Orleans in the early part of June. The last letter in the record from the husband to his wife is dated June 13, 1934. In this letter the husband writes about a house and says something about coming to see his wife and asks her to write again soon. Plaintiff wrote the defendant company on April 24, 1935, almost six months after the death of her husband, asking for information about him and stating that she heard he was dead. She also stated in that letter that she had stayed with her husband once in March, 1934, and again from April to June, 1934, and that he sent her away on June 7, 1934, telling her that he would come home in a month or so."

It seems to be conceded by counsel for both sides that the above are fair statements of the facts, and we shall add nothing thereto except to state that our reading of the record has convinced us that the reason why the husband, the deceased, went to Woodville, Mississippi, in the latter part of the year 1932 and the wife to the City of New Orleans was that they were both sick and that each needed medical attention. Their only source of revenue was the allowance, or benefit, of $33 per month paid to the husband by the defendant company, which amount was not sufficient to maintain both and pay for the medical attention which they needed. The wife went to New Orleans and lived with her brother, who supported her, and the husband went to Woodville and lived with relatives. The testimony in the record satisfies us that the reason for their separation originally was that each needed the assistance of relatives. There is nothing whatever in the record to indicate that there was ever at any time the slightest estrangement between them, and there is nothing remotely suggestive of a desire or intent on the part of either to end permanently their marital relations.

On the contrary, it is certain, we think, that neither ever so intended. The district judge and the Court of Appeal referred to the letters written by the husband to his wife in the year 1934. During that year we find that he wrote her twice in the month of February, three times in the month of March, four times in the month of April, and once in the month of June. We have read these letters and find that the husband addressed his wife in terms as endearing and affectionate as an unlettered man could. They are in fact love letters. He told her repeatedly that he loved her; that he needed and constantly

longed for her companionship, and expressed the hope that conditions would improve so that they could again be together. Her replies are not in the record, but that she did reply is shown by his letters.

Further commenting on the testimony, we stress the fact that on two occasions the husband, while at Woodville, sent to his wife, who was in New Orleans, money with which to pay bus fare from New Orleans to Woodville and return so that she might visit him. She did visit him twice, once in March, when she stayed with him one week, and again in April, when she stayed with him until June. On each of these visits she shared his room and bed. But she found it necessary to return to New Orleans, where her brother provided her with room and board. After leaving her husband in Woodville in the month of June, 1934, plaintiff did not see him again. He died in November of that year.

■ Under these facts and circumstances, we hold that the deceased and his wife were "living together" at the time of his death.

■ It is true that, from the latter part of 1932 to the date of the husband's death in November, 1934, this husband and wife did not continuously dwell together under the same roof, but during the greater portion of that time were living a considerable distance apart. But the question whether, as a matter of law, a married couple is "living together" does not hinge on the time they are separated or the distance they are apart, but upon the nature and character of the separation and the intention of the parties respecting it. The relationship of husband and wife, once established, is presumed to continue. The mere fact of separation alone cannot under the law be construed as an intent on the part of either to put an end to that relationship. It is true that long continued physical separation, unexplained, may give rise to an inference that the parties are not living together within the meaning which the term "living together" is generally understood to have. But such an inference might not be drawn if all the facts pertaining to the separation were known. The intent of the parties is the chief element to be considered in determining whether the relationship, once begun, has been ended.

■ The contract of marriage under our law implies a "living together" by the contracting parties. The rights and duties of married persons are prescribed by the Revised Civil Code. The wife must live with her husband, and the husband must receive her and furnish her with whatever is required for the convenience of life, in proportion to his means and condition. Civil Code, Articles 119, 120. This relationship is shown to have been assumed in this case, and there is no evidence whatever to indicate, much less proof to show, that this couple ever intended to abandon that relationship. On the contrary, it is shown to our entire satisfaction that they never intended to do so.

■ In legal contemplation, a husband and wife are living together, though driven by stress of circumstances or pecuniary difficulties to separate, if there is no in-

tention on the part of either to sever their marital relations permanently. If there be no estrangement, no intent to sever existing marital relations, no intent to change the relations or obligations created by the contract of marriage, the husband and wife are living together, as a matter of law. This, in substance, is what was held by the Court of Appeal, Second Circuit, in the case of Harris et al. v. Louisiana Oil Refining Corporation, 13 La.App. 416, 127 So. 40.

Counsel for defendant say with reference to that case that the ruling is not applicable here, because that was a case under the Workmen's Compensation Law. But what the court there said as to the meaning of the term "living together" is applicable in any case where the question involved is whether a husband and wife are living together.

In its second opinion the Court of Appeal held that there was an actual break in the marital relations between the plaintiff and her husband for several months, and that even under the Workmen's Compensation Law "this was probably sufficient to bar her recovery"; citing Milton v. Long-Bell Lumber Co., 165 La. 336, 115 So. 582, 584. But in that case the court found as a fact that the parties "voluntarily chose to reside apart" and that the evidence "shows conclusively that he [the husband] had abandoned her; and * * * that she had acquiesced in abandonment".

For the reasons assigned, the judgment of the Court of Appeal under review is reversed and set aside, and it is now ordered that there be judgment in favor of the plaintiff, Mary Eloise Robinson, and against the defendant, Standard Oil Company of Louisiana, in the sum of $396, as prayed for in plaintiff's petition, with interest from judicial demand until paid; defendant to pay all costs.